**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

KAVIN MAURICE RHODES,
               *Plaintiff-Appellant,*

      v.

M. ROBINSON, R&R Officer; RON
BLEVINS, R&R Sergeant; SARA
MALONE, Ombudsman; C. NELSON,
Correctional Officer; V. PAZO,
Correctional Officer; B. JONES,
Sergeant; ROBERTSON, Sergeant; J.
TIDWELL, Correctional Officer; A.
LOPEZ, Facility Captain; HUEBNER,
Lieutenant,
          *Defendants-Appellees.*

No. 03-15335

D.C. No.
CV-02-05018-
REC(DLB)

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Eastern District of California
Robert E. Coyle, Senior Judge, Presiding

Submitted May 14, 2004*
San Francisco, California

Filed August 19, 2004
Amended April 25, 2005

Before: Diarmuid F. O'Scannlain, Eugene E. Siler, Jr.,** and
Kim McLane Wardlaw,*** Circuit Judges.

*The panel unanimously finds this case suitable for decision without oral argument. *See* FED. R. APP. P. 34(a)(2).

**The Honorable Eugene E. Siler, Jr., Senior United States Circuit Judge for the Sixth Circuit, sitting by designation.

***Judge Wardlaw was drawn to replace Judge Michael Daly Hawkins on the panel. See G.O. 3.2.

Opinion by Judge O'Scannlain

## COUNSEL

Kavin Maurice Rhodes, *pro se*, Lancaster, California.

Bill Lockyer, Robert R. Anderson, Allen Crown, James E. Flynn, and John W. Riches II, for the respondent, Office of the Attorney General, Sacramento, California.

## ORDER

The opinion filed August 19, 2004, is hereby ordered amended as follows:

Slip op. at 11715, lines 15-16: Delete "harmed the prisoner and (5) was not narrowly tailored to advance a legitimate correctional goal." and replace it with "chilled the inmate's exercise of his First Amendment rights,[11] and (5) the action did not reasonably advance a legitimate correctional goal."

Slip op. at 11715, lines 29-30: Delete "were not undertaken in narrowly tailored furtherance of legitimate penological purposes." and replace it with "were not undertaken to advance legitimate penological purposes."

---

[11]If Rhodes had not alleged a chilling effect, perhaps his allegations that he suffered harm would suffice, since harm that is more than minimal will almost always have a chilling effect. Alleging harm *and* alleging the chilling effect would seem under the circumstances to be no more than a nicety. *See, e.g., Pratt*, 65 F.3d at 807 (deciding that alleged harm was enough to ground a First Amendment retaliation claim without independently discussing whether the harm had a chilling effect); *Valandingham v. Bojorquez*, 866 F.2d 1135, 1138 (9th Cir. 1989) (same).

Slip op. at 11716-17: Delete the paragraph on page 11716, lines 28-35, and 11717, lines 1-12, that begins "In this context, and at the pleading stage" and delete the paragraph on page 11717, lines 13-20, that begins "Our cases, in short, are clear" and replace them with "In this context, and at the pleading stage, we have *never* required a litigant, *per impossibile*, to demonstrate a *total* chilling of his First Amendment rights to file grievances and to pursue civil rights litigation in order to perfect a retaliation claim. Speech can be chilled even when not completely silenced. In *Mendocino Environmental Center v. Mendocino County*, we pointed out that the proper First Amendment inquiry asks "whether an official's acts would chill *or* silence a person of ordinary firmness from future First Amendment activities." 192 F.3d 1283, 1300 (9th Cir. 1999) (emphasis added), (quoting *Crawford-El v. Britton*, 93 F.3d 813, 826 (D.C. Cir. 1996), *vacated on other grounds*, 520 U.S. 1273 (1997) (internal quotation marks and citation omitted)). Because "it would be unjust to allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity," Rhodes does not have to demonstrate that his speech was "actually inhibited or suppressed." *See id.* Rhodes' allegations that his First Amendment rights were chilled, though not necessarily silenced, is enough to perfect his claim."

Except as herein modified, the panel has voted unanimously to deny the Petition for Rehearing. Judge O'Scannlain and Judge Wardlaw have voted to reject the Petition for Rehearing En Banc and Judge Siler so recommended.

The full court has been advised of the petition for rehearing en banc and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petition for rehearing and the petition for rehearing en banc are DENIED. No further petitions shall be entertained.

## OPINION

O'SCANNLAIN, Circuit Judge:

We must resolve a legal quandary that only Joseph Heller, the author of *Catch-22*, could have imagined: Do the exhaustive efforts of an incarcerated prisoner to remedy myriad violations of his First Amendment rights demonstrate that his First Amendment rights were not violated at all?

I

Kavin Maurice Rhodes is currently imprisoned at California State Prison, Los Angeles County, in Lancaster, California. Proceeding *pro se*, he brings this § 1983 action against several correctional officers ("the officers") at the California Correctional Institution ("CCI") in Tehachapi, California, alleging that they repeatedly retaliated against him for exercising his First Amendment rights when he was previously incarcerated there.[1]

A

Rhodes's conflict with the officers has its genesis in the most unlikely of places: the servicing of his Canon typewriter. It seems that every time Rhodes shipped his typewriter for off-site repairs, he not only would discover "considerable . . . new damage" upon its return, but correctional officer M. Robinson would intentionally delay sending Rhodes's typewriter for further repairs. Angered by these actions, Rhodes

---

[1]Because this appeal arises from the district court's decision to grant the officers' Federal Rule of Civil Procedure 12(b)(6) motion to dismiss, we treat each of Rhodes's factual allegations as true and construe them in a light most advantageous to him by drawing all reasonable inferences in his favor. *See, e.g.*, *Gompper v. VISX, Inc.*, 298 F.3d 893, 896 (9th Cir. 2002); *TwoRivers v. Lewis*, 174 F.3d 987, 991 (9th Cir. 1999). We draw our recital of the facts from Rhodes's First Amended Complaint, liberally quoting his words and retaining his emphases.

eventually filed an inmate grievance criticizing Robinson's conduct and requesting that, in the future, his typewriter be returned to him in its original shipping container so that "in the event that the typewriter failed to function, [he] could assign blame to the appropriate parties." His grievance was summarily denied.

A few months later, and allegedly "in **retaliation** for [his] submission of the grievance," Robinson "forced [him] to send either his CD player, or his television home, in order to receive his typewriter" which had recently returned from another round of repairs. When Rhodes refused to relinquish either of those devices, Robinson refused to return his type-writer and ordered correctional officer C. Nelson to confiscate Rhodes's CD player. Robinson subsequently withheld both Rhodes's CD player and his typewriter.[2]

In response, Rhodes promptly drafted a "group appeal"[3] on behalf of himself and his fellow inmates. That appeal, con-tained in the record, alleged that Robinson had a "personal vendetta" against inmates who possess personal property (especially those who possess personal typewriters) and that Robinson frequently hampered inmates' efforts to obtain their personal property from the "Receiving and Release" office. Signed by approximately 120 of his fellow inmates, Rhodes's group appeal is punctuated with comments from inmates

---

[2]Robinson ultimately defended his actions by citing CCI operational procedures stating that inmates were limited to possession of "2 electric appliances (AC)." Rhodes not only claims that his typewriter was "**bat-tery operated**" and thus "**not** considered an appliance," but proffers prison property records and repair invoices indicating that, for long peri-ods prior to filing his first grievance against Robinson, Rhodes simulta-neously possessed his CD player, television, and typewriter without interference. He also alleges that before he was allowed to purchase the typewriter—some ten years before these events unfolded—he was required to pay a $20 service charge to have an AC outlet in his cell disas-sembled so that the typewriter would not be considered "**electrical**."

[3]*See* CAL. CODE REGS. tit. 15, § 3084.2(f).

claiming that—beyond a generally disrespectful attitude—Robinson often arbitrarily withheld their personal property and otherwise damaged or altered their belongings.

Allegedly in an effort to mask these misdeeds, and in purported retaliation for Rhodes's having prepared and submitted the group appeal, Robinson soon altered Rhodes's CD player in order to make it appear as though Rhodes had stolen another inmate's property—and "thereby [to] justify its total confiscation."[4] To further cover his tracks, Robinson then "**conspired**" with prison ombudswoman Sara Malone to withhold filing of the group appeal—thus evading CCI's legal duty promptly to respond to the grievance.[5]

In hopes that one of Robinson's superiors might convince him to relinquish Rhodes's typewriter, Rhodes approached Lieutenant Huebner with a request for assistance. While Huebner was kind enough to discuss the matter with Robinson and his colleague, R. Blevins, neither admitted wrongdoing. Instead, both allegedly insisted that the only reason Rhodes had not received his typewriter was because he had refused to request it from them. With seemingly nowhere else to turn, Rhodes then sought out CCI's Facility Captain, A. Lopez, to whom he "verbally described the entire saga of events . . . ." Lopez asked Rhodes to submit his complaints in writing, which he promptly did. Simultaneously, Rhodes forwarded to Lopez his only copy of the grievance he originally filed against Robinson.

Unfortunately, Lopez never responded to Rhodes's filing

---

[4]This, Rhodes claims, was "[a] common practice of Defendant M. Robinson, [intended] to perfect his retaliations against inmates[ ] that exercise their rights to utilize the institution's internal grievance process."

[5]Rhodes had styled the grievance an "emergency appeal." *See* CAL. CODE REGS. tit. 15 § 3084.7(a) ("Usual time limits for staff response shall not apply to emergency appeals, which shall be resolved in the shortest practical time.").

and he "obstinately refused to return to [Rhodes his] documentary evidence." Instead, Rhodes asserts, the defendants soon initiated a conspiracy to transfer him to the High Desert State Prison in Susanville, California, as "a[ ] collective, and retaliatory measure, to avoid having to respond to any of [his] grievances." As part of this "nefarious scheme," Rhodes soon was ordered to relinquish all personal property to the defendants in preparation for his scheduled transfer. Concerned that his property would be retaliatorily destroyed by the defendants, Rhodes then filed a preemptive grievance.

While this "elaborate ruse" was unfolding, Rhodes—fearing that his internal efforts to secure relief would continue to bear only poisonous fruit—turned to outside authorities for assistance: He filed a complaint with the Kern County Grand Jury. During its investigation, ombudswoman Malone informed the Grand Jury that she had delivered Rhodes's group appeal to the prison's "Men's Advisory Coun[cil]" for "remedial action," which (as formally memorialized in a letter sent to Rhodes shortly thereafter) quickly prompted the Grand Jury to dismiss Rhodes's complaint on grounds that he retained an unexhausted avenue for administrative relief. However, Rhodes alleges—and he has submitted a sworn declaration from the Chairman of the Men's Advisory Council which supports his claim—that the group appeal was never sent to the Council for action.[6]

As Rhodes contemplated his next move, fate intervened to thwart the correctional officers' scheme to transfer him. For Rhodes long had been considering donating a kidney to his

---

[6]Not surprisingly, Rhodes thus charges that Malone's conduct during the course of the Grand Jury proceedings is further evidence of her conspiratorial efforts to suppress his complaints. In this vein, he further notes that, as an association of *inmates*, the Men's Advisory Council had no authority to remedy misconduct by *correctional officers*—thus suggesting that Malone's response to the Grand Jury's inquiry was (without regard to its truth or falsity) deliberately designed to mislead investigators into prematurely dismissing Rhodes's complaint.

ailing mother, and officials in the Department of Correc-
tions's medical division preempted his transfer on grounds
that such a move would interfere with donor compatibility
testing. When Rhodes went to retrieve his property, Blevins
"was very disgruntle[d] and short with [him], and began to
make references to some of the claims that [he] had made
against . . . Robinson." When Rhodes inquired into the status
of his preemptive grievance, Blevins responded that it had
been forwarded to the prison Appeals Coordinator[7] —and
then promptly confiscated twelve of Rhodes's compact discs
and his Laser Lens Cleaner. These actions were "perceived by
[Rhodes] as . . . further[ ] . . . retaliations against [him] for the
submission of the 'Group Appeal.' " Rhodes then requested
his typewriter, and when Blevins reluctantly returned with it,
Rhodes discovered that it had been "*completely destroyed*."

His will unshakably steeled by these events, Rhodes
promptly filed a second Grand Jury complaint—not only
rehearsing the parade of indignities visited upon him in retali-
ation for his administrative complaints (including the scheme
to transfer him from CCI), but identifying Malone's "apocry-
phal and specious" misrepresentations to the Grand Jury and
charging that she "ha[d] unwittingly allowed herself to
become goaded into participating in a[ ] criminal conspiracy
to obstruct justice." While his complaint was actively being
investigated by the Grand Jury, Rhodes subsequently was
accosted by three correctional officers. They allegedly
ordered him into the prison chapel, brandished pepper spray,
and "in a fashion that can only be described as some sort of
perverted **sexual-strip-tease**" forced Rhodes slowly to dis-
robe, bend over, and "spread [his] buttocks apart." For
approximately five minutes, the officers mockingly threatened
to transfer him from CCI. Not long after this physical assault

---

[7]When Rhodes subsequently asked Huebner about the status of his pre-
emptive grievance, Huebner allegedly responded "[S]omeone stole your
grievance out of my locker," and stated that if asked, he would testify that
Rhodes had refused to retrieve the typewriter.

took place, the Grand Jury dismissed Rhodes's second complaint.

## B

His internal administrative grievances and external appeals universally having been thwarted, Rhodes turned to the federal courts for relief. Proceeding *pro se*, he filed his first amended § 1983 complaint in March 2002, alleging unlawful First Amendment retaliation based upon the events outlined above. His prayer sought (1) a declaratory judgment that the officers violated his First Amendment rights; (2) an injunction prohibiting the officers from retaliating against him in the future, requiring them to return his property, and preventing them from removing him from his position as a legal clerk or confiscating his legal papers; and (3) both compensatory and punitive damages.[8] Succinctly summarizing the substance of his claim, Rhodes explained that, in response to his repeated grievances, he was:

> **retaliated** against, in the form of the confiscation and destruction, of his personal property, in violation of the First Amendment . . . [and that] each defendant, and all of them, *collectively conspired* to chill the effect of Plaintiff's exercise of his First Amendment rights [through actions that] do[ ] not advance any legitimate penological goals, nor [are] tailored narrowly enough to achieve such goals.

[8]Because Rhodes is no longer incarcerated at CCI, his prayers for injunctive relief are likely moot except insofar as they demand the return of any property still in the officers' possession. However, it is firmly established that claims for monetary damages survive a prisoner's release from the officers' custody. *See, e.g.*, *Bd. of Pardons v. Allen*, 482 U.S. 369, 371 n.1 (1987) (release on parole); *Johnson v. Moore*, 948 F.2d 517, 519 (9th Cir. 1991) (transfer); *cf. Brady v. Smith*, 656 F.2d 466, 468 (9th Cir. 1981) (changed conditions). And because his claim for damages necessarily entails a determination whether the officers' alleged conduct violated his rights, his separate request for declaratory relief is subsumed by his damages action.

On July 15, the state filed a motion to dismiss under Rule 12(b)(6) asserting that the defendants enjoyed qualified immunity because Rhodes was "unable to show a chill or deterrence of the exercise of his First Amendment constitutional rights," and because "[i]t is not clearly established that a prisoner has any constitutional right to be free from retaliatory action that does not chill and/or deter the exercise of his constitutional rights." On December 13, 2002, Magistrate Judge Dennis L. Beck recommended that the State's motion be granted, reasoning that

> plaintiff makes no showing of a chilling or deterring effect of defendants' actions. After filing the grievance that spawned the alleged retaliation, plaintiff continued to assert his First Amendment rights by drafting a group appeal on May 9, 2001. He filed a complaint with the Kern County Grand Jury. Plaintiff submitted additional grievances concerning the typewriter in May 2001. . . . Finally, plaintiff filed this lawsuit. These actions, which plaintiff alleges in his complaint, show that plaintiff's speech was not chilled or deterred.[9]

On January 16, 2003, Rhodes filed written objections to Judge Beck's report. The district court nonetheless fully adopted the Magistrate's findings and recommendation and granted the State's motion to dismiss on January 31, 2003. Judgment was entered on February 4, 2003, and Rhodes timely appealed to this court.

---

[9]Apparently because Judge Beck found that Rhodes had not "allege[d] facts that show a constitutional violation" (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)), he did not proceed to the second step of the qualified immunity analysis: whether the right in question was clearly established. *Saucier*, 533 U.S. at 201. In briefing to this court, the officers do not raise the issue of qualified immunity at all; they merely assert that Rhodes's complaint fails to state a claim for relief because his pleadings demonstrate that the officers' actions did not chill the exercise of Rhodes's First Amendment rights.

## II

*There was only one catch and that was Catch-22, which specified that a concern for one's own safety in the face of dangers that were real and immediate was the process of a rational mind. Orr was crazy and could be grounded. All he had to do was ask; and as soon as he did, he would no longer be crazy and would have to fly more missions. Orr would be crazy to fly more missions and sane if he didn't, but if he was sane he had to fly them. If he flew them he was crazy and didn't have to; but if he didn't want to he was sane and had to. Yossarian was moved very deeply by the absolute simplicity of this clause of Catch-22 and let out a respectful whistle.*

*"That's some catch, that Catch-22," he observed.*

*"It's the best there is," Doc Daneeka agreed.*

> — Joseph Heller, *Catch-22,* at 47 (6th ed. 1976)

## A

**[1]** Even where conditions of confinement do not implicate a prisoner's due process rights, inmates "retain other protection from arbitrary state action . . . within the expected conditions of confinement. They may invoke the First and Eighth Amendments and the Equal Protection Clause of the Fourteenth Amendment where appropriate, and may draw upon internal prison grievance procedures and state judicial review where available." *Hines v. Gomez*, 108 F.3d 265, 269 (9th Cir. 1997) (quoting *Sandin v. Conner*, 515 U.S. 472, 487 n.11 (1997)); *see also Pell v. Procunier*, 417 U.S. 817, 822 (1974) ("A prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.").

**[2]** Of fundamental import to prisoners are their First Amendment "right[s] to file prison grievances," *Bruce v. Ylst*, 351 F.3d 1283, 1288 (9th Cir. 2003), and to "pursue civil rights litigation in the courts." *Schroeder v. McDonald*, 55 F.3d 454, 461 (9th Cir. 1995).[10] Without those bedrock constitutional guarantees, inmates would be left with no viable mechanism to remedy prison injustices. And because purely retaliatory actions taken against a prisoner for having exercised those rights necessarily undermine those protections, such actions violate the Constitution quite apart from any underlying misconduct they are designed to shield. *See, e.g.*, *Pratt v. Rowland*, 65 F.3d 802, 806 & n.4 (9th Cir. 1995) ("[T]he prohibition against retaliatory punishment is 'clearly established law' in the Ninth Circuit, for qualified immunity purposes. That retaliatory actions by prison officials are cognizable under § 1983 has also been widely accepted in other circuits.") (citing *Schroeder*, 55 F.3d at 461; *Barnett v. Centoni*, 31 F.3d 813, 815-16 (9th Cir. 1994); *Frazier v. Dubois*, 922 F.2d 560, 561-62 (10th Cir. 1990); *Madewell v. Roberts*, 909 F.2d 1203 (8th Cir. 1990); *Gill v. Mooney*, 824 F.2d 192, 194 (2d Cir. 1987); *Bridges v. Russell*, 757 F.2d 1155 (11th Cir. 1985); *Buise v. Hudkins*, 584 F.2d 223 (7th Cir. 1978)).

**[3]** Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights,[11] and (5) the action did not reason-

---

[10]*Cf. Bounds v. Smith*, 430 U.S. 817, 828 (1977) ("[T]he fundamental constitutional right of access to the courts requires prison authorities to . . . provid[e] prisoners with adequate law libraries or adequate assistance from persons trained in the law").

[11]If Rhodes had not alleged a chilling effect, perhaps his allegations that he suffered harm would suffice, since harm that is more than minimal will almost always have a chilling effect. Alleging harm *and* alleging the chilling effect would seem under the circumstances to be no more than a nicety. *See, e.g., Pratt*, 65 F.3d at 807 (deciding that alleged harm was enough to ground a First Amendment retaliation claim without independently discussing whether the harm had a chilling effect); *Valandingham v. Bojorquez*, 866 F.2d 1135, 1138 (9th Cir. 1989) (same).

ably advance a legitimate correctional goal. *See, e.g.*, *Resnick v. Hayes*, 213 F.3d 443, 449 (9th Cir. 2000); *Barnett*, 31 F.3d at 815-16.

## B

**[4]** The officers do not seriously contest the fact that Rhodes's complaint precisely satisfies these pleading requirements. Nor could they. Rhodes alleges that they (1) arbitrarily confiscated, withheld, and eventually destroyed his property, threatened to transfer him to another correctional institution, and ultimately assaulted him, (2) because he (3) exercised his First Amendment rights to file prison grievances and otherwise seek access to the legal process, and that (4) beyond imposing those tangible harms, the guards' actions chilled his First Amendment rights and (5) were not undertaken to advance legitimate penological purposes. Rhodes's First Amended Complaint is, in short, the very archetype of a cognizable First Amendment retaliation claim. *See, e.g.*, *Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir. 2001) (holding that "repeated threats of transfer because of [the plaintiff's] complaints about the administration of the [prison] library" were sufficient to ground a retaliation claim); *Hines*, 108 F.3d at 269 (holding that the retaliatory imposition of a ten-day period of confinement and loss of television—justified by a correctional officer's false allegation that the plaintiff breached prison regulations—violated the First Amendment); *Pratt*, 65 F.3d at 807 ("[I]t would be illegal for [corrections] officials to transfer and double-cell [plaintiff] solely in retaliation for his exercise of protected First Amendment rights."); *Valandingham v. Bojorquez*, 866 F.2d 1135, 1138 (9th Cir. 1989) (holding that, if correctional officers indeed called plaintiff a "snitch" in front of other prisoners in retaliation for his filing grievances, it would violate the First Amendment).

Instead, the officers argue not that Rhodes has failed adequately to plead a First Amendment retaliation claim because he "can prove no set of facts . . . that would entitle [him] to

relief," *Johnson v. Knowles*, 113 F.3d 1114, 1117 (9th Cir. 1997), but that the very facts proven by Rhodes's complaint and accompanying documentation demonstrate that, notwithstanding his well-pleaded claim to the contrary, Rhodes is not entitled to relief. While this analytic approach arguably comports with case law holding that a "court need not . . . accept as true allegations that contradict matters properly subject to judicial notice or . . . unwarranted deductions of fact" on a motion to dismiss, *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) (citations omitted), the officers' claim cannot be squared with our First Amendment precedents.

**[5]** In this context, and at the pleading stage, we have *never* required a litigant, *per impossibile*, to demonstrate a *total* chilling of his First Amendment rights to file grievances and to pursue civil rights litigation in order to perfect a retaliation claim. Speech can be chilled even when not completely silenced. In *Mendocino Environmental Center v. Mendocino County*, we pointed out that the proper First Amendment inquiry asks "whether an official's acts would chill *or* silence a person of ordinary firmness from future First Amendment activities." 192 F.3d 1283, 1300 (9th Cir. 1999) (emphasis added), (quoting *Crawford-El v. Britton*, 93 F.3d 813, 826 (D.C. Cir. 1996), *vacated on other grounds*, 520 U.S. 1273 (1997) (internal quotation marks and citation omitted)). Because "it would be unjust to allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity," Rhodes does not have to demonstrate that his speech was "actually inhibited or suppressed." *See id.* Rhodes' allegations that his First Amendment rights were chilled, though not necessarily silenced, is enough to perfect his claim.

C

The consequences of a contrary holding would be remarkably perverse. Indeed, adopting the rule proposed by the offi-

cers and embraced by the district court would prevent virtually any prisoner retaliation suit from reaching federal court. As Rhodes repeatedly observes, the Prison Litigation Reform Act of 1995 ("PLRA") establishes strict prerequisites to the filing of prisoner civil rights litigation. Most notably, PLRA requires that "No action shall be brought with respect to prison conditions under . . . 42 U.S.C. 1983[ ], or any other Federal law, by a prisoner . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).[12] Rejecting Rhodes's suit on the basis of his having filed administrative grievances seeking to vindicate his rights thus would establish a rule dictating that, by virtue of an inmate's having fulfilled the requirements necessary to pursue his cause of action in federal court, he would be precluded from prosecuting the very claim he was forced to exhaust.

[6] The district court's further holding that Rhodes's filing *this very lawsuit* somehow precludes relief on the retaliation claim he therein presents goes even further afield. Indeed, were we to adopt such a theory, prisoner civil rights plaintiffs would be stuck in an even more vicious Catch-22. The only way for an inmate to obtain relief from retaliatory conduct would be to file a federal lawsuit; yet as soon he or she does so, it would become clear that he or she cannot adequately state a claim for relief. Like its fictional counterpart, this catch exudes an "elliptical precision about its perfect pairs of parts that [i]s both graceful and shocking." *Catch-22* at 47. Unlike Colonel Cathcart, however, we are unwilling to indulge a rule that "would result in the anomaly of protecting only those individuals who remain out of court." *Lamar v. Steele*, 693 F.2d 559, 562 (5th Cir. 1982).

---

[12]"PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

### III

**[7]** Two final observations, regarding qualified immunity, are in order. Beyond the State's failure to address the issue of qualified immunity in this court (notwithstanding Rhodes's careful attention to the issue in his briefs and the State's prior invocation of immunity in district court), we must first reiterate our firm recognition that "the prohibition against retaliatory punishment is 'clearly established law' in the Ninth Circuit, for qualified immunity purposes." *Pratt*, 65 F.3d at 806. We think our case law is abundantly clear that the infliction of harms other than a total chilling effect can establish liability for such conduct, and there can be no serious doubt that the harms allegedly visited upon Rhodes in response to his exercise of First Amendment rights went well beyond any marginal chilling of his rights.

At the same time, we cannot help but further observe that the officers' particular claim to immunity in the district court —that "[i]t is not clearly established that a prisoner has any constitutional right to be free from retaliatory conduct *that does not chill and/or deter the exercise of his constitutional rights*") (emphasis added)—is flatly inconsistent with the concept of qualified immunity in the first instance. The requirement that controlling law be clearly established before an officer can be subjected to suit serves a particular purpose in our system of judicial review. Given the basic demand that state actors conform their conduct to the law, there is something particularly unfair about holding officials liable for conduct that they did not (and could not) know was unlawful *at the time they decided to act. See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) ("If the law *at that time* was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade *conduct* not previously identified as unlawful.") (emphasis added); *cf. Saucier*, 533 U.S. at 202 ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be

clear to a reasonable officer that his conduct was unlawful *in the situation he confronted*.") (emphasis added).

By their argument to the district court, the officers would have qualified immunity turn *on the harm eventually caused* by an official's conduct. But that puts the cart before the horse: It shifts the focus of the qualified immunity inquiry from the time of the conduct to its aftermath and effect, and therefore would make immunity hinge upon *precisely* the kind of post hoc judgment that the doctrine is designed to avoid. *See Rudebusch v. Hughes*, 313 F.3d 506, 519 (9th Cir. 2002) ("[T]he relevant inquiry is not whether, in hindsight, [the officer] acted unreasonably, but instead whether his decision was reasonable in light of the information that he possessed at the time of implementation."). Taken to its logical extreme, the officers' claim would insulate any retaliatory conduct from later sanction, for no officer can observe whether his or her retaliation has successfully chilled a prisoner's rights until long after deciding to act. We simply cannot sanction a claim to qualified immunity on that basis.

## IV

The judgment of the district court is hereby REVERSED, and the case is REMANDED for further proceedings consistent with this opinion.