**Reynaldo AMBROS–MARCIAL,
et al., Plaintiffs,**

v.

**UNITED STATES, Defendant.**

**No. 03–CV–230 TUC JMR.**

United States District Court,
D. Arizona.

July 12, 2005.

A. James Clark, Esq., Clark & Moore, James Franklin Metcalf, Metcalf & Metcalf PC, Yuma, AZ, John A. Micheaels,

Esq., Beale & Micheaels PC, Phoenix, AZ, for Plaintiffs.

Daniel G. Knauss, US Attorney's Office, Tucson, AZ, for Defendant.

## ORDER

ROLL, District Judge.

Eleven illegal aliens tragically died in Arizona while attempting to cross the Sonoran Desert in May 2001. Plaintiffs, the aliens' surviving relatives, filed suit under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346(b), claiming that the manager of the Cabeza Prieta National Wildlife Refuge ("Cabeza Prieta"), where decedents were found, caused their deaths by refusing to allow an immigrant rights group to erect water drums on the refuge in April 2001. Defendant moved to dismiss, arguing that (1) the Court lacks jurisdiction because the decision was a "discretionary function" under 28 U.S.C. § 2680(a), and (2) Plaintiffs failed to state a claim because Defendant owed no duty to Plaintiffs. The Court ordered limited discovery on the jurisdictional issue and denied the motion to dismiss, without prejudice and with leave to amend. On October 22, 2004, Defendant filed a motion for summary judgment and motion to dismiss.

Defendant's concerns about the safety of aliens (who might be encouraged to cross the area because of the presence of water drums), the safety of refuge visitors (who have been victimized by a small percentage of illegal crossers), and environmental harm (arising from habitat disruption and littering of debris) gave Defendant the discretion to decline to authorize the erection of water drums on Cabeza Prieta, and therefore the Court has no jurisdiction to hear this case. In addition, Defendant owed no duty to affirmatively assist trespassers illegally crossing Cabeza Prieta in avoiding the obvious dangers of a hostile desert. Therefore, Defendant's motion for summary judgment is granted.

## Background

Considered in the light most favorable to Plaintiffs, the material facts are as follows. In 1994, Defendant launched "Operation Gatekeeper" through the Immigration and Nationalization Service. The effort resulted in fewer illegal border crossings in urban areas, but more crossings through hostile desert regions. Aliens frequently died from heat exhaustion and dehydration.

In early 2001, Humane Borders sought permission to place 65–gallon water stations, identified by 30–foot high blue flags that are visible from miles away, in Organ Pipe Cactus National Monument and Wilderness ("Organ Pipe"), Buenos Aires National Wildlife Refuge ("Buenos Aires"), and Cabeza Prieta. (Hoover Decl. ¶¶ 9–11, Ex. B, Pls.' Opp. Def.'s Mot. Dismiss.) All three locations are on the Arizona–Mexico border and are operated by Defendant through the Department of the Interior (DOI). Organ Pipe is on the eastern border of Cabeza Prieta. The water stations were to provide hydration to aliens illegally crossing the border, and Humane Borders was to be responsible for maintaining the stations. (*Id.* ¶ 9.) Organ Pipe and Buenos Aires granted the permits, although Organ Pipe required that fliers be placed on the Mexico side of the border warning aliens about the danger of desert migration and alerting them to the specific locations of the Organ Pipe water stations. (Permit at 2–3, Ex. C, Pls.' Opp. Def.'s Mot. Dismiss.)

Donald Tiller, refuge manager of Cabeza Prieta, received Humane Borders' proposal on March 30, 2001. (First Tiller Decl. ¶ 8, Ex. A, Def.'s Mot. Dismiss.) Humane Borders sought to erect seven stations on roads within Cabeza Prieta. (Tiller Memo., Attach. 2, First Tiller Decl.) Tiller discussed the proposal with the Fish and Wildlife Service's regional office, and on

April 13, 2001, he recommended denial for the following reasons:

(1) increased traffic through the Refuge to and from the stations could:

 (a) adversely affect the Sonoran Pronghorn, an endangered species;

 (b) produce "untold negative consequences on refuge resources," similar to those caused by "water for wildlife";

 (c) exacerbate the problems of trash, fires, habitat destruction, etc., in the vicinity of the stations;

(2) approval would need a "Section 7 [Endangered Species] consultation," and should first be addressed in the "Comprehensive Conservation Plan";

(3) the stations would aid and could increase illegal border crossing;

(4) stations could endanger the illegal aliens if:

 (a) the stations were expected but were found empty;

 (b) someone contaminated the stations (a concern of "Mexican officials");[1]

(5) other sources of water in the Refuge were already known and illegally being used by smugglers and border crossers;

(6) Wilderness character would be impaired by the large drums and blue flags;

(7) Refuge law enforcement officers opposed the stations;

(8) the Bureau of Land Management experienced non-compliance with similar permit restrictions, and might decide not to renew the permits;

(9) establishing stations might lead to long term liability for the Refuge to maintain them; and

(10) the proposed locations would conflict with use by visitors.

(Tiller Memo.) Tiller was also "concerned that the placing of water caches in the Refuge would give aliens a false sense of security, given the great size and aridness of the Refuge." (First Tiller Decl. ¶ 9.) Tiller knew from law enforcement officials who policed Cabeza Prieta that illegal aliens had destroyed vegetation in areas not visited by the public, and had broken into vehicles of refuge visitors. (Tiller Dep. at 30:22–31:16, Exh. B, Def's Stmnt. Facts Supp. Summ. J. (Oct. 20, 2004) ("Tiller Dep.").)

Humane Borders informed Tiller that aliens were dying because of "Operation Gatekeeper," and that Organ Pipe and Buenos Aries had permitted Humane Borders to erect water stations. (Hoover Decl. ¶¶ 14–15.) Nonetheless, on April 18, 2001, Tiller sent Humane Borders a denial letter and told Humane Borders how to appeal. (Letter, Attach. 3, First Tiller Decl.) In the letter, Tiller declared that the proposed use was "non-compatible with the mission of the National Wildlife Refuge and its Wilderness area," and that the use could negatively impact the habitat of the Sonoran Pronghorn antelope. (*Id.*) Tiller did not indicate under what statute or regulation he was denying the use. *Id.* In fact, he relied not on a particular provision but on the generally applicable statutory framework.[2] (Tiller Dep. at 36:24–37:18.) No "compatibility determination" had been conducted, and Tiller did not consider the proposed use an "emergency."

---

**1.** Plaintiffs claim that "Mexican officials" supported the stations. (Hoover Decl. ¶¶ 5–6.) Neither Defendant nor Plaintiffs identify the Mexican officials to whom they refer.

**2.** Tiller later stated that 65 Fed.Reg. 62,468 (Oct. 18, 2000) authorizes denial without making a compatibility determination, but he did not recall if he actually used that provision in making his decision. (*Id.* at 38:18–25, 40:2–5.)

(Second Tiller Decl. ¶ 9, Ex. 1, Def.'s Reply Pls.' Opp. Def.'s Mot. Dismiss.)

On or about May 23, 2001, before Humane Borders had time to appeal, the decedents crossed the Arizona–Mexico border into Cabeza Prieta. (First Tiller Decl. ¶ 14.) Their bodies were found 14 miles away from the nearest proposed water station (*id.*), but the group had walked within one mile of a proposed water station site at Charlie Bell Pass (Hoover Decl. ¶ 13; Map, Ex. A, Second Tiller Decl.). According to Plaintiffs, if that proposed water station had existed decedents would have survived. (Hoover Decl. ¶ 13) After the deaths, Cabeza Prieta permitted Humane Borders to erect blue flags at several of the watering stations that exist for wildlife use. (*Id.* ¶ 17.)

*Jurisdiction*

## 1. Legal Standards

### a. Summary judgment

Defendant cites both Fed.R.Civ.P. 12(b)(1) and 56 to support its motion. Where a motion "properly should be labeled a dismissal for lack of jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1)," the Court may "consider items outside the pleading ... but [shall] resolve all disputes of fact in favor of the non-movant ... similar to the summary judgment standard ...." *Dreier v. United States*, 106 F.3d 844, 847 (9th Cir.1996). Summary judgment is appropriate where "there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]he evidence of the nonmoving party is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. 2505.

### b. FTCA

The Court has jurisdiction over "claims against the United States ... for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment...." 28 U.S.C. § 1346(b)(1). Nevertheless, such jurisdiction does not extend to "[a]ny claim based upon ... the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government." 28 U.S.C. § 2680(a).

"[T]he Supreme Court has prescribed a two-part test for determining the applicability of the discretionary function exception." *Whisnant v. United States*, 400 F.3d 1177, 1180 (9th Cir.2005) (citing *United States v. Gaubert*, 499 U.S. 315, 322–25, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991), and *Berkovitz v. United States*, 486 U.S. 531, 536–37, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988)). The government carries the burden of showing that the exception applies. *Id.* at 1181.

First, the exception applies if the challenged action is discretionary, but not if it violated "a mandatory statute, policy, or regulation." *Id.* at 1180–81. Conduct is discretionary if "it involves an element of judgment or choice." *Berkovitz*, 486 U.S. at 536, 108 S.Ct. 1954. An action is not discretionary if " 'a federal statute, regulation, or policy specifically prescribe[s] a course of action' that was not followed." *O'Toole v. United States*, 295 F.3d 1029, 1033 (9th Cir.2002) (quoting *Berkovitz*, 486 U.S. at 536, 108 S.Ct. 1954).

Second, the challenged action must "involve[ ] a decision susceptible to social, economic, or political policy analysis." *Id.*

at 1181. "[W]hen statutes, policies, regulations, or guidelines allow a government official to exercise discretion, 'it must be presumed that the agent's acts are grounded in policy when exercising that discretion.'" *Bibeau v. Pacific Northwest Research Foundation, Inc.*, 339 F.3d 942, 945 (9th Cir.2003) (quoting *United States v. Gaubert*, 499 U.S. 315, 324, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991)). "'[T]he basis for the discretionary function exception was Congress' desire to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort."'" *Id.* at 945 (quoting *Berkovitz*, 486 U.S. at 536–37, 108 S.Ct. 1954).

### 2. Applicable Statutes and Regulations

Both the National Wildlife Refuge System Administration Act, 16 U.S.C. §§ 668dd–668ee, and the Wilderness Act of 1964, 16 U.S.C. §§ 1131–36, are applicable to Cabeza Prieta. The Administration Act requires that no use be permitted on a wildlife refuge unless the Secretary of the Interior first determines that the use is "compatible with the [ ] purposes for which such areas are established." 16 U.S.C. § 668dd(d)(1). Those purposes include "protection and conservation of fish and wildlife that are threatened with extinction." *Id.* Regulations indicate that "[n]o person shall trespass, including but not limited to entering, occupying, using, or being upon, any national wildlife refuge ...." 50 C.F.R. § 26.21(a). The Wilderness Act states that wilderness areas shall be protected and preserved in "their wilderness character." 16 U.S.C. §§ 1131(a). Regulations governing wilderness areas shall hold "inconsistent uses ... to a minimum." 43 C.F.R. § 19.6.

The U.S. Fish and Wildlife Service, which manages Cabeza Prieta, publishes specific guidelines for determining whether to grant or deny a proposed use of a wildlife refuge. *See* Final Compatibility Policy Pursuant to the National Wildlife Refuge System Improvement Act of 1997, 65 Fed.Reg. 62,484–62,496 (Oct. 18, 2000), at Appx. B, Exh. A, Def.'s Stmnt. Facts Supp. Summ. J. (Oct. 20, 2004) (the "Manual"). A use may only be permitted if it is "compatible," and only after completion of a "compatibility determination." *Id.* ¶ 2.9(A), 2.11(A)(3). A "compatibility determination" is a report that the refuge manager prepares after researching various aspects of the proposed use, including a minimum 14–day period of public review and comment. *Id.* ¶¶ 2.6(A), 2.12. Some exceptions allow the manager to permit a use without a compatibility determination, such as in an emergency. *Id.* ¶ 2.10.

In certain circumstances, a use "should" be denied without conducting a compatibility determination, including when the use is "inconsistent with public safety," and when the use "conflicts with other resource or management objectives ...." *Id.* ¶ 2.10(D)(1). Even if a use is "otherwise compatible," it "may" be denied "based on compliance with other laws, the System mission, policy, refuge purposes, availability of resources to manage the use, possible conflicts with other uses, public safety, and other administrative factors .... Usually, a refuge manager will make this decision prior to making a compatibility determination and completing one will be unnecessary." *Id.* ¶ 2.15.

The comments to the Manual indicate that a compatibility determination is not required when uses are denied. "[U]ses permitted must be shown to be compatible. The converse is not true. If an application for a use is denied, it need not be shown that the use is not compatible." *See* Final Compatibility Regulations Pursuant to the National Wildlife Refuge System Improvement Act of 1997, 65 Fed.Reg. 62,458–01, 62468 (Oct. 18, 2000) (to be codified at 50

C.F.R. pts. 25, 26, and 29). According to the Manual's primary author, J. Kenneth Edwards, ¶ 2.10(D) is not designed to be an exclusive list of reasons that justify denials without making compatibility determinations, and ¶ 2.10(D)(1)(g) was written to include "potential conflicts that we could not think of or anticipate." (Edwards Dep. at 25:22–26:6, Exh. A, Def.'s Stmnt. Facts Supp. Summ. J.)

Any "finding, determination, or decision" by a manager is to be made using "sound professional judgment," *i.e.*, the manager should decide "consistent with principles of sound fish and wildlife management and administration, available science and resources, . . . and other applicable laws . . . [including] a refuge manager's field experience and knowledge of the particular refuge's resources." Manual ¶ 2.6(U). *See also id.* ¶¶ 2.6(B); 2.11(A).

3. Discussion

 a. Whether Defendant's acts were discretionary

 (i) Denial of the permit

 The denial of Humane Borders' request to erect water stations on Cabeza Prieta was discretionary. No statute or regulation "specifically prescribed" that the proposal be accepted, or that Tiller act differently in denying the permit. *O'Toole*, 295 F.3d at 1033. On the contrary, the statutes leave the permission for even compatible uses up to the discretion of the Secretary of the Interior.

The Manual allows the manager to review permit requests based on his "sound professional judgment." Manual at ¶ 2.6(U). Paragraphs 2.10(D) and 2.15 of the Manual list contraindications for proposed uses. The sections read as follows:

 [2.10] D. Denying a proposed use without determining compatibility.

 (1) The Refuge Manager should deny a proposed use without determining compatibility if any of the following situations exist:

 (a) The proposed use conflicts with any applicable law or regulation (e.g., Wilderness Act, Endangered Species Act, Marine Mammal Protection Act, Migratory Bird Treaty Act);

 (b) The proposed use conflicts with any applicable executive order, or written Department of the Interior or Service policy;

 (c) The proposed use conflicts with the goals or objectives in an approved refuge management plan (e.g., comprehensive conservation plan, comprehensive management plan, master plan or step-down management plan);

 (d) The proposed use has already been considered in an approved refuge management plan and was not accepted;

 (e) The proposed use is inconsistent with public safety;

 (f) The proposed use is a use other than a wildlife-dependent recreational use that is not manageable within the available budget and staff; or

 (g) The proposed use conflicts with other resource or management objectives provided that the Refuge Manager specifies those objectives in denying the use.

. . . . .

2.15 May We Deny Uses That are Compatible?

A determination that a use is compatible does not require the use to be allowed. Determinations on whether to allow otherwise compatible uses are based on compliance with other laws, the System mission, policy, refuge purposes, availability of resources to manage the use, possible conflicts with other uses, public safety, and other administrative factors. The Refuge Manager must clearly document and describe in writing

the administrative reasons for not permitting a compatible use. Usually, a refuge manager will make this decision prior to making a compatibility determination and completing one will be unnecessary.

*Id.* ¶¶ 2.10(D) and 2.15.

Although Tiller did not identify which portion of the Manual he based his denial on, either of the two sections could have been used. Paragraph 2.15 grants particularly broad discretion for denial, including factors such as "refuge purposes, ... conflicts with other uses, public safety, and other administrative factors." The reasons for denial listed in Tiller's memo fall well within this provision, in particular his statements that increased traffic could adversely affect refuge resources and destroy vegetation, approval would need a "Section 7 [Endangered Species] consultation" and should first be addressed in the "Comprehensive Conservation Plan," the stations could run empty or be poisoned, legal liability could occur, and use by visitors could be impaired, particularly by increased instances of break-ins into visitors' vehicles and by the negative aesthetic impact of the water stations' blue flags.

Even the more specific standards in ¶ 2.10(D) justify the denial. The danger that water stations could be poisoned or be found empty, would aid illegal border crossing (including drug smuggling) and increase conflict between aliens and visitors, and would increase trash and fires, are factors that Tiller could have viewed as "inconsistent with public safety." *Id.* ¶ 2.10(D)(1)(e). The increase in trespassing, negative impact on wilderness character, destruction of vegetation, and threat to the Sonoran Pronghorn habitat could have been viewed as "conflict[ing] with" the statutory provisions that protect the refuge from trespassers, the wilderness from deterioration of its aesthetic character, and wildlife from encroachment on

their habitat. *Id.* ¶ 2.10(D)(1)(a). The impact on Sonoran Pronghorn habitat, specifically mentioned in the denial letter, could also have been viewed as "conflict[ing] with other resource or management objectives ...." *Id.* ¶ 2.10(D)(1)(g).

Plaintiffs argue that ¶ 2.10(D) is a mandatory list of factors that leaves a manager no discretion in its implementation. On the contrary, although denial is required if a use is not compatible, the judgment regarding whether a use is not compatible, even under ¶ 2.10(D), is itself discretionary. Subparagraphs (a), (e), and (g) of ¶ 2.10(D) "involve[ ] an element of judgment or choice," *Berkovitz*, 486 U.S. at 536, 108 S.Ct. 1954, wherein the interests of Cabeza Prieta are balanced against the interests of the proposed use.

Nor did denial of the use violate the other, less relevant regulations cited by Plaintiffs. The Fish and Wildlife Service's safety policy seeking to "correct hazardous conditions" on federal property is a generalized policy promoting safety, and does not require that Defendant erect water stations to make Cabeza Prieta, a hostile desert region, "safe" for trespassing pedestrians. *See Valdez v. United States*, 56 F.3d 1177, 1180 (9th Cir.1995) (finding discretionary function exception applicable because "broad mandate to warn the public of [and guard them from] 'special hazards' ... necessarily encompasses an element of discretion" in implementation of the policy). Similarly, the Department of the Interior Manual requiring assistance to "public safety" organizations is insufficiently specific as to which organizations fall under the policy and the specific manner in which Cabeza Prieta must cooperate with such organizations.

(ii) Failure to conduct a compatibility determination

 Tiller also acted within his discretion when he failed to make a compatibility

determination before denying the use. Plaintiffs argue that only ¶ 2.10(D) of the Manual authorizes denial without conducting a compatibility determination, and that none of the conditions of ¶ 2.10(D) for denying incompatible uses apply in this case. However, as noted above, the denial fits within the terms of ¶ 2.10(D).

In addition, although the heading of ¶ 2.15 refers to "compatible" uses, and Tiller ultimately identified the use as "non-compatible," ¶ 2.15 could still have authorized the denial. "Non-compatible" is not a term used or defined in ¶¶ 2.6, 2.10(D), or 2.15, so it does not limit the scope of Tiller's denial to ¶ 2.10(D). Further, the text of ¶ 2.15 indicates that it applies to uses that are "*otherwise* compatible" (emphasis added), but that are undesirable for various reasons, so that a use denied under ¶ 2.15 could be characterized as "non-compatible." Paragraphs 2.10(D) and 2.15 are primarily distinguished, not by their application to incompatible or compatible uses, but by language indicating that under ¶ 2.10(D), the manager "should" deny certain uses, while under ¶ 2.15, the manager "may" deny uses. Paragraph 2.15 could not apply exclusively to "compatible" uses, because it authorizes denial without a compatibility determination, which is the only way to know that a particular use is "compatible."

Finally, although Plaintiffs argue that Tiller believed that a compatibility determination was necessary, he was only recognizing the existence of such a requirement if the use was to be permitted. (First Tiller Decl. ¶ 12, Ex. A, Def.'s Mot. Dismiss.)

On initial review of the motion to dismiss, the Court stated that a compatibility determination might have been required, but the Court asked the parties to provide input on whether a compatibility determination would have taken so long that it would not have been completed before de-

cedents crossed the border. Tiller indicates in his deposition that a compatibility determination on a controversial proposal could take between 30–60 days to complete. (Tiller Dep. at 48:20–49:2.) Therefore, whether the failure to conduct a compatibility determination actually caused decedents' deaths is uncertain on this record. Yet because the Court now finds the compatibility determination to have been discretionary, the existence of a fact issue regarding causation does not prevent dismissal.

### b. Policy considerations

■ Denial of the permit directly involved "social, economic, or political policy analysis." The Manual authorizes denial based on issues of "policy," "laws," and "administrat[ion]." Manual at ¶¶ 2.10(D) and 2.15. The denial was specifically based on public and administrative factors. *See* Tiller Memo. Tiller balanced the negative factors associated with illegal border crossing through Cabeza Prieta against the purposes for which Cabeza Prieta exists, namely "to secure for the American people of present and future generations the benefits of an enduring resource of wilderness." 16 U.S.C. § 1131. Balancing these factors was presumptively, and actually, within Tiller's discretion.

Recently, the Ninth Circuit provided guidance for determining when a decision involves "social, economic, or political policy analysis":

[A] dominant theme in our case law is the need to distinguish between design and implementation: we have generally held that the design of a course of governmental action is shielded by the discretionary function exception, whereas the implementation of that course of action is not. . . .

[F]or example, designing [a] road without guardrails was a choice grounded in

policy considerations and was therefore shielded under the discretionary function exception, but maintaining the road was a safety responsibility not susceptible to policy analysis." *Whisnant v. United States*, 400 F.3d 1177, 1181–82 (9th Cir.2005). *Whisnant* also compared the "design" decision in *Valdez* and *Childers*, where "Park rangers used their discretion to balance, within the constraints of the resources available to them, a statutory mandate to provide access with the goal of public safety," *Valdez*, 56 F.3d at 1180 (quoting *Childers v. United States*, 40 F.3d 973, 976 (9th Cir.1994)), with the "implementation" decision in *Summers v. United States*, 905 F.2d 1212 (9th Cir. 1990), where the failure to warn the public of hot coals on a beach "was [not] the result of a decision reflecting the competing considerations of the Service's sign policy." *Valdez*, 56 F.3d at 1180 (quoting *Summers*, 905 F.2d at 1215).

In this light, whether to permit or deny the building of water stations (or any proposed use) is a "design" decision balancing competing factors; whereas, if approved, the "implementation" of erecting and maintaining water stations could possibly involve non-discretionary safety standards. Plaintiffs argue that ¶ 2.10(D) of the Manual is the "policy" issue that merely requires "implementation" against proposed uses. However, judgments authorized by ¶ 2.10(D), and to an even greater degree by ¶ 2.15, do not involve application of a merely "scientific," "professional," or "safety" checklist, but they include "social, economic, or political policy" issues. *Whisnant*, 400 F.3d at 1181. A manager is to balance "competing considerations" relating to wildlife, habitat, visitors, and the aliens themselves. *Valdez*, 56 F.3d at 1180. Therefore, in "implementing" the Manual, the manager "designs" policy regarding whether a proposed use is incompatible (or is undesirable even if it may be otherwise compatible) with the purposes of the refuge or wilderness area.

### Tort Liability

Even if jurisdiction exists, dismissal would be appropriate under Fed.R.Civ.P. 12(b)(6).

### 1. Legal Standards

#### a. Failure to State a Claim

Rule 12(b)(6) permits dismissal due to "failure to state a claim upon which relief can be granted." "Dismissal is proper only where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir.2001). The Court must "treat each of [the complaint's] factual allegations as true and construe them in a light most advantageous to [Plaintiffs] by drawing all reasonable inferences in [Plaintiffs'] favor." *Rhodes v. Robinson*, 380 F.3d 1123, 1126 n. 1 (9th Cir.2004). However, the Court need not accept conclusions of law or unreasonable inferences of fact. *Ileto v. Glock Inc.*, 349 F.3d 1191, 1200 (9th Cir.2003).

#### b. Duties to Trespassers

"[T]he United States can be held liable under the FTCA only when liability would attach to a private actor under the law of the place where the tort occurred." *Olson v. United States*, 362 F.3d 1236, 1240 (9th Cir.2004). Where the highest state court has not adjudicated an issue, the federal court must make a reasonable prediction of how the state court would rule. *Med. Lab. Mgmt. Consultants v. Am. Broad. Cos., Inc.*, 306 F.3d 806, 812 (9th Cir.2002). "[A]bsent any contrary precedent, Arizona courts generally follow" the Restatement (Second) of Torts. *Wilson v. U.S. Elevator Corp.*, 193 Ariz. 251, 255–56, 972 P.2d 235, 239–40 (Ariz.App.1998).

"In the typical 'trespasser' case, plaintiff may not recover unless the landowner has been guilty of some willful or wanton disregard for the plaintiff's safety." *Webster v. Culbertson,* 158 Ariz. 159, 161, 761 P.2d 1063 (1988) (citing Restatement 2d Torts § 333). "[A] possessor of land is not liable to trespassers for physical harm caused by his failure to exercise reasonable care (a) to put the land in a condition reasonably safe for their reception .…" Restatement 2d Torts § 333. Exceptions to § 333 apply only to controllable forces, hidden artificial conditions, and the owner's activities on the land. Restatement 2d Torts § 334–39. No duty to rescue arises merely from the realization that action is necessary to aid him or her. Restatement 2d Torts § 314.

 Liability may exist for intentionally or negligently preventing another from rendering aid. *Miller v. Arnal Corp.,* 129 Ariz. 484, 632 P.2d 987, 994 (1981) (discussing Restatement 2d Torts §§ 326 and 327).

> One who intentionally prevents a third person from giving to another aid necessary to prevent physical harm to him, is subject to liability for physical harm caused to the other by the absence of the aid which he has prevented the third person from giving.
>
> One who knows or has reason to know that a third person is giving or is ready to give to another aid necessary to prevent physical harm to him, and negligently prevents or disables the third person from giving such aid, is subject to liability for physical harm caused to the other by the absence of the aid which he has prevented the third person from giving.

Restatement 2d Torts §§ 326 and 327. For liability under these sections, the danger to the victim must be imminent. *See Miller,* 129 Ariz. at 491, 632 P.2d at 994 (noting that §§ 326 and 327 require "an imperilled plaintiff"). *See also Keesee v. Freeman,* 772 S.W.2d 663, 668 (Mo.App. 1989) (citing *Miller*) ("The cases which have applied the doctrine all involved fact situations in which the plaintiff was in immediate need of assistance from the rescuer because of a present and life-threatening danger.").

2. Discussion

Plaintiffs' amended complaint alleges that Defendant "forced" decedents to cross the border into Cabeza Prieta by means of "Operation Gatekeeper," which increased patrols in urban areas. Amended Complaint at 3 (May 27, 2003). Plaintiffs also allege that Defendant knew that decedents would be in danger without the water stations. *Id.* at 4–7.

a. Unreasonable Inferences of Fact

The Court does not accept allegations that Defendant actually "forced" decedents to cross the border or knew that decedents in particular were in danger, and Plaintiffs have not opposed Defendant's motion by suggesting that evidence might exist to substantiate such allegations. Instead, Plaintiffs assert that Defendant had a duty not to prevent Humane Borders from erecting water stations in Cabeza Prieta, based on Defendant's general knowledge. The Court interprets the complaint as merely alleging a breach of that duty.

b. Duty to Aid / Prevention of Aid

 Plaintiffs have failed to state a claim under Arizona law. First, no duty exists based on the presence of decedents on Cabeza Prieta. A landowner has no duty to aid trespassers, and natural, obvious, dangerous conditions, such as are found a hostile desert region, are not subject to an exception to Restatement 2d Torts § 333. The conduct alleged by Plaintiffs does not indicate an intentional prevention of aid to decedents. Plaintiffs

do not reasonably allege that Defendant knew that these decedents would cross the border, nor that an attempt was thwarted to aid particular border crossers. Plaintiffs argue that Defendant assumed a duty to aid decedents by permitting water stations in nearby lands, but the complaint does not support the implication that Defendant misled aliens into thinking that water stations were available in Cabeza Prieta.

■ The central theory upon which Plaintiffs postulate liability—the negligent prevention of aid to decedents—also fails. When Defendant decided to refuse permission for erecting water stations, decedents were not in danger. Plaintiffs allege that decedents did not even attempt to cross Cabeza Prieta until several weeks later. Therefore, Humane Borders was not "ready to give" aid to the endangered decedents, in the sense that Humane Borders was not prevented from an imminent attempt to provide decedents water. No Arizona case has imposed liability in a situation analogous to that of decedents. Instead, *Miller* implies, and other cases state, that the danger and the aid prevented must be imminent to the negligence.

Examination of the reporters' notes to § 327 confirms that no liability exists on the facts alleged. The broadest imposition of liability under § 327 is contained in example 3:

A, while excavating, carelessly breaks a water main which supplies water for the use of the fire department. A day or so later but before the main can be repaired, a fire breaks out on B's premises nearby. From lack of water which could have been supplied by the flow from the main, had it not been broken, the fire consumes B's house. B while carefully and reasonably attempting to remove some valuable chattels is burned. A is subject to liability to B.

Ex. 3., rptrs. notes to § 327. This example is based on the underlying facts of *Concordia Fire Ins. Co. v. Simmons Co.*, 167 Wis. 541, 168 N.W. 199, 200 (1918). The Wisconsin Supreme Court justified its imposition of liability in this situation because "[i]t is not for a person who has interfered with such existing right or privilege to say that it is a mere gratuity on the part of the municipality, or that the municipality cannot be compelled to continue such service or be held responsible for failure to do so." *Id.* at 200.

The present situation is distinguishable from *Concordia Fire* by the trespasser status of decedents and those who sought to aid them. Land owners are not required to aid trespassers, so Defendant cannot be said to have interfered with an "existing right or privilege," held by decedents, to have Humane Borders erect water stations on Defendant's land, where Defendant has not consented to the presence of either decedents or Humane Borders. Restatement 2d Torts § 327 does not extend to the complaint in this case.

*Conclusion*

Dismissal is required based on lack of jurisdiction, because the denial of the water stations was a discretionary policy decision. Even if the Court has jurisdiction, the complaint fails to allege a duty towards decedents that Defendant breached.

Accordingly,

**IT IS ORDERED** that Defendant's motion for summary judgment [DOC # 24] is **GRANTED.**

**IT IS FURTHER ORDERED** that this case is **DISMISSED FOR LACK OF JURISDICTION.** The Clerk of the Court is directed to enter judgment accordingly and close this case.